**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-4066

**ROLLING PLAINS CONSTRUCTION, INC.,** a Colorado corporation,

Plaintiff,

v.

**DAVID LOFTON**, an individual.

Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Rolling Plains Construction, Inc. ("Rolling Plains" or the "Company"), for its Complaint against Defendant David Lofton ("Lofton") as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Rolling Plains is a Colorado corporation with a principal place of business at 12331 North Peoria Street, Henderson, Colorado 80640, US.

2. Upon information and belief, Lofton is currently a resident of the State of Arizona and resides at 3477 W. Silverdale Road, Queen Creek, Arizona 85142.

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Court has personal jurisdiction over Lofton because his conduct caused injury to Rolling Plains in Colorado. Further, Lofton maintained substantial contacts with Colorado throughout his approximately nineteen years of employment with Rolling Plains by

regularly conducting business on the Company's behalf, exercising authority over Company operations, misusing Company-issued credit cards, and stealing Company funds.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and conduct herein occurred in this District.

## GENERAL ALLEGATIONS

6. Plaintiff Rolling Plains Construction, Inc. is a specialty commercial construction contractor that provides fireproofing, insulation, firestopping, steel coating, gypsum underlayment, and related services for large-scale commercial and industrial construction projects throughout the United States.

7. Rolling Plains maintains a satellite office located in an unincorporated area of Pinal County, Arizona, near Apache Junction, through which it conducts construction operations in Arizona and the surrounding region.

8. Rolling Plains employed Lofton for approximately nineteen years, from approximately February 2006 until March 2025. During his tenure, Lofton held various positions, eventually serving as General Field Superintendent in which he managed field operations for the Company, including in Colorado. In that role, Lofton was responsible for supervising all work sites and overseeing approximately 200 to 300 field employees.

9. In connection with his supervisory responsibilities, Rolling Plains assigned Lofton three Company credit cards to use for legitimate business expenses associated with job-site operations, such as fuel and field equipment purchases.

10. Lofton executed a Corporate Credit Card Use Agreement acknowledging, among other things, that the cards were Company property, that their use was "limited to business purposes authorized by the Company," that the cards "must not be used for any personal,

unauthorized, or illegal charges," and that any misuse "may result in cancellation of this Card and may further result in disciplinary action up to and including termination of [his] employment." *See* **Exhibit 1**.

11. Beginning on or about March 14, 2023, and continuing through on or about February 19, 2025, a period of approximately two years, Lofton devised and executed a deliberate scheme to defraud Rolling Plains by making unauthorized charges on the Company credit cards assigned to him.

12. As part of that scheme, Lofton created fictitious vendor accounts on the Square payment platform and billed the Company credit cards for products he never actually ordered for the Company. Specifically, Lofton created at least two fictitious companies on the Square payment platform, one under the name "Spraywell" and another under the name "Global Industrial," and used them to process fraudulent charges on the Company credit cards assigned to him. He then disguised those charges as legitimate business expenses and exploited his position as the supervisor of all Rolling Plains' work sites to ensure the Company would not detect his scheme.

13. This was not a hastily devised scheme; rather, it was a deliberate and sustained course of conduct that required planning, concealment, and repeated acts of deception over an extended period of time.

14. Further, over the course of approximately two years, Lofton made at least 152 unauthorized transactions on the three Company credit cards assigned to him, totaling approximately $1,346,426.38.

15. These unauthorized transactions were directed to the following merchants and fictitious vendors: Whatnot.com (totaling approximately $922,270.76), the fictitious Spraywell

Square account (totaling approximately $326,511.19), Fanatics Live (totaling approximately $70,893.79), Global Industrial via a Square account (totaling approximately $16,392.00), and Monster Card Shop (totaling approximately $10,358.64).

16. Lofton used the vast majority of the stolen funds to purchase repackaged sports trading cards on the Whatnot application, an online platform that hosts live "breaks" where buyers pay to participate in a random allocation of cards from sealed boxes or cases. As Lofton himself admitted, the Whatnot platform "functions less like traditional retail and far more like gambling"—"buyers are not purchasing a known item at a fixed value. Instead, they are purchasing chance and probability." Sellers host live "breaks," where buyers pay for "a small, random allocation of cards from a sealed box or case," and "[t]he experience is fast-paced, highly emotional, and designed to create urgency, excitement, and anticipation." Sellers "actively hype 'chase cards,' often highlighting that a single card in a box might be worth $10,000 or more," but "more than 99% of the cards in those products are worth far less than what was paid to participate." *See* **Exhibit 2** at 10.

17. Lofton has admitted that while he may physically possess some sports cards, "their market value is often dramatically lower than the amount paid to acquire them. The vast majority of the money was lost to probability, not converted into recoverable assets." *See id.*

18. In addition to the funds spent on sports card gambling, Lofton does not dispute that he used approximately $15,000 of Rolling Plains' stolen funds for a personal trip unrelated to any Company business. *See id.* at 11.

19. At no time did Lofton have authorization from Rolling Plains to use the Company credit cards for personal expenditures, to create fictitious vendor accounts, or to process charges through the fraudulent Square accounts.

20. In March 2025, the Company conducted an audit of the three credit cards that had been assigned to Lofton.

21. During that audit, the Company discovered 152 unauthorized transactions between March 14, 2023, and February 19, 2025, totaling $1,346,426.38. The Company traced those transactions to the fictitious Spraywell Square account, online sports card purchasing platforms, and other unauthorized merchants. When the Company called Mastercard to obtain a vendor address associated with the Spraywell transactions processed through Square, Mastercard informed the Company that the address was in Queen Creek, Arizona, the town where Lofton lives, even though the actual Spraywell company is located in Florida.

22. When the Company confronted Lofton about the unauthorized charges, Lofton initially denied any wrongdoing and maintained that the Spraywell transactions were valid. The Company directed Lofton to make a purchase from Spraywell in the presence of Rolling Plains' representatives to demonstrate that the vendor did not use Square for credit card processing, and Lofton attempted to do so. The Company then called Spraywell, and the vendor confirmed that it had no record of Rolling Plains until that day, when Lofton had called in an order in front of the Company's representatives. Lofton asked for the weekend to "get all this sorted out."

23. Between October 16, 2024 and February 21, 2025, Lofton paid Rolling Plains approximately $9,731.43, apparently in an effort to repay a portion of the amounts owed.[1]

24. Shortly thereafter, on or about March 15, 2025, Lofton resigned from Rolling Plains via text message. In that text message, Lofton stated, "I am writing to formally resign from my position at Rolling Plains Construction, effective immediately. I take full responsibility

[1] On February 26, 2025, Lofton paid Rolling Plains $25,000 for an unrelated expense.

for my actions regarding the unauthorized Square transactions and want to be clear that I acted alone. I respectfully request that the investigation not be continued." *See* **Exhibit 3**.

25. In March 2025, Lofton eventually confessed, offered no excuses for his conduct, and gave Rolling Plains' owner a check for $10,000. Upon information and belief, a portion of that check was to repay the Company for work performed on Lofton's personal trailer and thus did not constitute repayment of stolen funds.

26. On March 25, 2025, Deputy Drake from the Pinal County Sheriff's Office took a report regarding Lofton's conduct and the 152 unauthorized transactions. *See* **Exhibit 2**.

27. On April 21, 2025, Detective Alvarado of the Pinal County Sheriff's Office confirmed the 152 unauthorized transactions totaled $1,346,426.38 on the three Company credit cards assigned to Lofton. *See id.*

28. On April 29, 2025, Detective Alvarado made contact with Lofton at his residence. Lofton referred the detective to his attorney, who subsequently contacted Detective Alvarado and stated that he was attempting to get Lofton on a payment plan. *See id.*

29. On June 3, 2025, Detective Alvarado placed Lofton under arrest at his residence. Lofton was transported to the Pinal County Jail and booked for Fraudulent Use of a Credit Card and Theft. *See id.*

30. On June 18, 2025, a Pinal County grand jury returned an Indictment charging Lofton with Fraudulent Schemes and Artifices, a Class 2 Felony, in violation of A.R.S. §§ 13-2310, 13-701, 13-702, and 13-801, in the Superior Court of Arizona in and for the County of Pinal, Case No. CR 202501167. *See* **Exhibit 4**.

31. The State of Arizona later amended the Indictment to allege Lofton's prior felony convictions, including: (a) Attempted Unlawful Use of Means of Transportation, a Class 6U

Felony (convicted October 3, 2003 in Maricopa County, Arizona, Case No. CR 2002099804); and (b) Theft, a Class 5 Felony (convicted in Larimer County, Colorado, Case No. DO0352006CR000262). *See* **Exhibit 5**.

32. On December 8, 2025, Lofton pled guilty to one count of Fraudulent Schemes and Artifices, a Class 2 non-dangerous Felony, in violation of A.R.S. §§ 13-2310A, 13-701, 13-702, and 13-801, committed on or between March 15, 2023, and March 1, 2025. *See* **Exhibit 6**.

33. As part of the plea agreement, Lofton stipulated to pay restitution for all economic losses arising from his criminal conduct, including $1,300,000.00 in restitution to Rolling Plains. *See* **Exhibit 7** at 2.

34. In his sentencing memorandum, Lofton offered to "stipulate to a civil judgment in [Rolling Plains'] favor for an amount corresponding to the restitution the Court will order," to "liquidate his remaining sports card inventory and apply all net proceeds directly to restitution," and to "assign [] rights to future sales of cards already in his possession," with proceeds paid to Rolling Plains. *See* **Exhibit 8** at 7. Upon information and belief, Lofton has not fulfilled these commitments.

35. Paragraph 9 of the applicable plea agreement expressly provides that the plea agreement "in no way affects any forfeiture proceedings pursuant to A.R.S. § 13-4301 *et seq*., § 13-2314, or § 32-1993, if applicable, nor does the plea agreement in any way compromise or abrogate any civil actions, including actions pursuant to A.R.S. § 13-2301 et seq. or § 13-4301 *et seq*. or the provisions of A.R.S. § 13-2314 or A.R.S. § 13-4310." *See* **Exhibit 7** at 3.

36. On February 9, 2026, the Superior Court of Arizona in Pinal County sentenced Lofton to seven years of supervised probation and incarceration for a period of 330 days with 300 days deferred. *See* **Exhibit 9** at 2.

37. The Court ordered Lofton to pay restitution in the amount of $1,300,000.00 to Rolling Plains, with monthly restitution payments to the Company of $500.00 commencing March 15, 2026. At the rate of $500 per month, and without considering interest, full payment of the restitution obligation would take approximately 216 years. The $500 monthly restitution payment ordered by the Arizona court is wholly inadequate. *See* **Exhibit 9;** *see also* **Exhibit 10**.

38. Despite repeated overtures from Rolling Plains and its counsel seeking substantial repayment in advance of sentencing, Lofton failed to make any meaningful repayment beyond the limited amounts previously described.

39. In his sentencing memorandum, Lofton admitted that he took money and that nearly all of it was used to purchase sports cards through the Whatnot app. *See* **Exhibit 8**. Lofton further admitted that approximately $15,000 was used for a personal trip. *See id.* Lofton also acknowledged that he violated the trust placed in him by Rolling Plains' owner, stating, "I know that I violated [the owner of Rolling Plains'] trust. I know how deeply wrong that was." *Id.*

40. In the sentencing memorandum, Lofton further admitted that he understood he "committed a crime, betrayed trust, and caused real harm." He stated that "[n]o one forced me to participate. I chose to continue despite mounting losses, and I take full responsibility for those decisions. I was wrong. Very wrong." *Id.*

41. As part of its presentencing investigation, the Pinal County Adult Probation Department independently characterized Lofton's conduct as follows: Lofton "misappropriated over one million dollars from his employer over a two-year period, resulting in significant financial harm and a substantial breach of trust given his 19-year employment and close relationship with the owners." *See* **Exhibit 2**. The Probation Department further found as an

aggravating factor that "the defendant's conduct in this case was not an isolated incident, but rather a continuing type of behavior." *Id.* at 7.

42. Lofton admitted that the stolen funds cannot be recovered, stating that "the money is gone the moment the break concludes, much like placing a bet at a casino," that "there is no mechanism to undo the transaction, return the product, or recover the funds," and that "the vast majority of the money was lost to probability, not converted into recoverable assets" that "cannot simply be 'flipped' or returned to" Rolling Plains. *See* **Exhibit 8**. Despite these admissions, Lofton promised to bring a $100,000 check to his sentencing to "reflect his commitment to paying restitution." *Id.* at 7.

43. Lofton tendered the $100,000 payment at sentencing on February 9, 2026. Since the sentencing hearing, Lofton has paid Rolling Plains only one restitution payment of $550.00.

44. As a result of Lofton's conduct, Rolling Plains has suffered damages in the amount of $236,144.95, plus interest. To date, Rolling Plains has received $110,281.43 in partial repayment from Lofton and is subject to a criminal restitution order that would take over two centuries to satisfy.[2] Lofton's promises to liquidate his remaining sports card inventory and stipulate to a civil judgment remain unfulfilled. Rolling Plains therefore brings this action to recover its damages, obtain treble damages as permitted by law, and secure equitable relief over the identifiable proceeds of Lofton's fraud.

**FIRST CLAIM OF RELIEF**
**(Civil Theft - C.R.S. § 18-4-405)**

45. Rolling Plains incorporates by reference all preceding paragraphs as though fully set forth herein.

[2] On April 2, 2026, Rolling Plains received a $1,000,000 payment from its insurance carrier in connection with Lofton's theft. Rolling Plains' damages as alleged herein have been reduced to account for this recovery.

46. Rolling Plains owned the funds used to pay charges incurred on its Company credit card accounts.

47. Lofton knowingly, without authorization, and through deception obtained $1,346,426.38 of Rolling Plains' funds by creating fictitious vendor accounts and fictitious companies on the Square payment platform, processing 152 unauthorized transactions on Rolling Plains' credit cards, and causing Rolling Plains to pay for products and services that he never ordered.

48. Lofton fabricated receipts to conceal the scheme and routed the proceeds of the fraudulent Square charges to his personal account.

49. Lofton intended to permanently deprive Rolling Plains of its funds, as demonstrated by his use of the vast majority of the stolen funds to purchase repackaged sports trading cards, his acknowledgement that "the money is gone the moment the break concludes, much like placing a bet at a casino," and his use of an additional approximately $15,000 for a personal trip.

50. As a direct and proximate result of Lofton's theft, Rolling Plains has been damaged in an amount not less than $236,144.95, plus interest. Pursuant to C.R.S. § 18-4-405, Rolling Plains is entitled to recover treble the amount of its actual damages, plus its costs and reasonable attorneys' fees incurred in bringing this action.

**SECOND CLAIM OF RELIEF**
**(Conversion)**

51. Rolling Plains incorporates by reference all preceding paragraphs as though fully set forth herein.

52. Rolling Plains owned the funds used to pay charges incurred on its Company credit card accounts.

53. Lofton intentionally and substantially interfered with Rolling Plains' possession of its funds by diverting $1,346,426.38 through 152 unauthorized credit card transactions over a period of approximately two years via fraudulent infrastructure and taking possession of the stolen funds for his personal use.

54. Rolling Plains did not consent to, authorize, or have knowledge of Lofton's use of the Company credit cards for personal expenditures, the creation of fictitious vendor accounts, or the processing of charges through the fraudulent Square accounts. To the contrary, Lofton signed a Corporate Credit Card Use Agreement expressly prohibiting such conduct.

55. As a direct and proximate result of Lofton's conversion of Rolling Plains' property, Rolling Plains has been damaged in an amount not less than $236,144.95, plus interest.

**THIRD CLAIM OF RELIEF**
**(Unjust Enrichment)**

56. Rolling Plains incorporates by reference all preceding paragraphs as though fully set forth herein.

57. Lofton received a benefit of at least $1,346,426.38 when he diverted Rolling Plains' Company funds for his personal use through 152 unauthorized credit card transactions processed through fictitious vendor accounts and fraudulent Square accounts and used those funds to purchase repackaged sports trading cards and to fund a personal trip.

58. Rolling Plains incurred a corresponding financial loss of $1,346,426.38 when Lofton misappropriated Rolling Plains' Company funds through the fraudulent scheme, resulting in the depletion of Company resources that were intended exclusively for legitimate business operations. Rolling Plains has received $110,281.43 in partial repayment, and has been partially reimbursed by its insurance carrier, leaving Rolling Plains with an outstanding loss in excess of $236,144.95.

59. Retaining the benefit of Rolling Plains' funds under these circumstances would be unjust, as Lofton obtained the funds solely through fraud, deceit, and theft, without providing any value to Rolling Plains in return.

60. As a result of Lofton's unjust enrichment, Rolling Plains has been damaged in an amount not less than $236,144.95, plus interest.

**FOURTH CLAIM OF RELIEF**
**(Breach of Fiduciary Duty)**

61. Rolling Plains incorporates by reference all preceding paragraphs as though fully set forth herein.

62. Lofton was acting as a fiduciary of Rolling Plains with respect to the management and expenditure of Company funds. Rolling Plains entrusted Lofton with three Company credit cards and granted him authority to make purchases on the Company's behalf in connection with his role supervising the Company's work sites. Lofton executed a Corporate Credit Card Use Agreement acknowledging that he would "be making financial commitments on behalf of the Company" and that he "agree[d] to be held personally liable for the total dollar amount of any improper charges incurred in connection with misuse" of the cards.

63. Lofton breached his fiduciary duty to Rolling Plains by secretly diverting $1,346,426.38 in Company funds for his personal use through 152 unauthorized credit card transactions processed via fictitious vendor accounts and fraudulent Square accounts, by concealing those transactions for approximately two years, and by using Company funds for personal gambling and a personal trip rather than for Rolling Plains' business purposes.

64. Accordingly, Rolling Plains suffered damages in an amount not less than $236,144.95, plus interest, and is further entitled to recover the compensation, salary, wages,

bonuses, benefits, and other compensation paid to Lofton during the period in which he breached his duties to Rolling Plains.

65. Lofton's breach of fiduciary duty caused damages to Rolling Plains because, absent Lofton's misuse of the Company credit cards entrusted to him and his concealment of the unauthorized transactions, Rolling Plains would not have lost the funds diverted for Lofton's personal benefit.

## FIFTH CLAIM OF RELIEF
## (Constructive Trust/Equitable Lien)

66. Rolling Plains incorporates by reference all preceding paragraphs as though fully set forth herein.

67. Through his fraudulent scheme, Lofton used funds wrongfully obtained from Rolling Plains to purchase sports trading cards and related inventory.

68. Lofton admitted that the money he took from Rolling Plains was used almost entirely to purchase sports trading cards.

69. The sports trading cards and related inventory constitute identifiable property acquired directly and traceably with Rolling Plains' funds.

70. Lofton admitted that he may possess at least a portion of the sports trading cards purchased with Rolling Plains' funds and has represented that he intends to liquidate those assets. In his sentencing memorandum, Lofton stated he would "[l]iquidate remaining sports card inventory and apply all net proceeds directly to restitution" and "[a]ssign rights to future sales of cards already in his possession, with proceeds paid to [Rolling Plains]." Upon information and belief, Lofton has failed to do so.

71. Because the sports trading cards and any proceeds derived from their sale are directly traceable to Rolling Plains' funds, equity requires that Lofton hold such property and proceeds for the benefit of Rolling Plains.

72. It would be unjust to permit Lofton to retain ownership, possession, or the benefit of property acquired with funds wrongfully taken from Rolling Plains.

73. Rolling Plains is therefore entitled to the imposition of a constructive trust over the sports trading cards and any proceeds derived from their sale, or, alternatively, an equitable lien against such property and proceeds in an amount equal to Rolling Plains' damages.

## PRAYER FOR RELIEF

WHEREFORE, Rolling Plains requests the following relief:

1. Damages against Lofton in an amount to be determined at trial;

2. Judgment against Lofton in favor of Rolling Plains in the amount of $236,144.95, plus interest, consistent with Lofton's offer to "stipulate to a civil judgment in [Rolling Plains'] favor for an amount corresponding to the restitution the Court will order";

3. Damages against Lofton in an amount equal to the compensation and benefits paid to him during the period of his breach;

4. Imposition of a constructive trust over all sports cards and proceeds acquired with Rolling Plains' funds, or alternatively, an equitable lien on such assets, and an order requiring Lofton to provide a full accounting of all sports cards and sale proceeds in his possession or control;

5. Treble damages as permitted by statute;

6. Pre- and post-judgment interest;

7. Costs, expenses, and attorneys' fees; and

8. Such other relief as the Court may deem just and proper.

**JURY DEMAND**

Rolling Plains hereby demands a trial by jury on all issues so triable in this action.

Dated: August 31, 2026

DAVIS GRAHAM & STUBBS LLP

/s/ Brett C. Painter

*Brett C. Painter*
*Hannah E. Goldstein*
3400 Walnut Street, Suite 700
Denver, CO 80205
Telephone: (303) 892-9400
Facsimile: (303) 893-1379
Email: brett.painter@davisgraham.com
hannah.goldstein@davisgraham.com
Attorneys for Plaintiff Rolling Plains Construction, Inc.